UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MUHAMMAD A. AZIZ,

                                     Plaintiff,

        – against –

THE CITY OF NEW YORK, EUGENE ("GENE") A. ROBERTS, WILLIAM ("BILL") KNAPP, BERNARD ("BARNEY") F. MULLIGAN, THEODORE ("TED") THEOLOGES, ANTHONY ("TONY") BOUZA, HENRY SUAREZ, FERDINAND ("ROCKY") CAVALLARO, FRANCIS ("FRANK") CILENTO, WILLIAM E. CONFREY, JOHN J. CONROY, THOMAS T. CUSMANO, SANFORD GARELIK, JOSEPH IACOVELLI, JOHN J. KEELEY, THOMAS C. RENAGHAN, FRANCIS ("FRANK") J.M. ROBB, JAMES RUSHIN, HOWARD G. SCHAETZLE, FRANCIS M. SULLIVAN, WINSTON W. DE VERGEE, WARREN TAYLOR, PATRICK J. TWOMEY, ERNEST VOHS, MICHAEL WILLIS, and JOHN/JANE DOES NUMBERED 1-50,

                                     Defendants.

---

Case No. 22-CV-4113

**<u>COMPLAINT</u>**

JURY TRIAL DEMANDED

**SHANIES LAW OFFICE LLC**

David B. Shanies
Deborah I. Francois
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com

*Attorneys for Plaintiff Muhammad A. Aziz*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

NATURE OF THE ACTION ..................................................................................................... 3

JURISDICTION AND VENUE .................................................................................................. 4

CONDITIONS PRECEDENT ..................................................................................................... 5

PARTIES ...................................................................................................................................... 5

JURY DEMAND ........................................................................................................................ 13

FACTS ........................................................................................................................................ 13

    A.    The Crime and Muhammad Aziz's Innocence .......................................................... 13

    B.    The Investigation and Suppression of Exculpatory Information .............................. 15

    C.    The Arrest, Trial, and Conviction .......................................................................... 22

    D.    The 1970s Post-Conviction Proceedings and Discovery of Exculpatory
        Information Withheld from the Defense .................................................................. 27

        1.    Mujahid Abdul Halim's Affidavits ............................................................... 27

        2.    The Revelation of Defendant Roberts's Identity and Some of
             His Knowledge ............................................................................................... 28

        3.    Benjamin Karim's Affidavit .......................................................................... 28

        4.    The New York County District Attorney's Office's Opposition and
             Trial Court's Decision .................................................................................... 29

    E.    The Joint Reinvestigation and Discovery of Additional Exculpatory
        Information Withheld from the Defense .................................................................. 30

    F.    The Joint Motion to Vacate and Trial Court's Decision ......................................... 32

    G.    The City of New York's Deliberate Indifference to Official Misconduct;
        *Brady* Violations; and Failure to Train, Supervise, and Discipline its Employees.... 33

        1.    The Fragmentation of the NYPD and BOSSI's Policies, Customs, and
             Practices of Suppressing Brady Evidence ...................................................... 34

        2.    The City's Unlawful Policies, Customs, and Practices Concerning the
             Use of Suggestive Identification Procedures and the Fabrication of
             Eyewitness Identifications and Testimony ..................................................... 39

DAMAGES ........................................................................................................... 43

CAUSES OF ACTION ........................................................................................... 45

    FIRST CAUSE OF ACTION
    42 U.S.C. § 1983: Denial of Due Process and Right to a Fair Trial,
    Fabrication of Evidence, and Suppression of *Brady* Information ........................... 45

    SECOND CAUSE OF ACTION
    42 U.S.C. § 1983: Malicious Prosecution and Denial of Fourth Amendment Rights ........... 48

    THIRD CAUSE OF ACTION
    42 U.S.C. § 1983: *Monell* Claim ........................................................... 50

    FOURTH CAUSE OF ACTION
    New York State Law: Malicious Prosecution ................................................. 52

    FIFTH CAUSE OF ACTION
    New York State Constitution: Denial of Due Process and Right to a Fair Trial,
    Fabrication of Evidence, Suppression of Exculpatory Information, and
    Malicious Prosecution ...................................................................... 54

    SIXTH CAUSE OF ACTION
    New York State Law: Negligence ............................................................ 55

REQUEST FOR RELIEF ........................................................................................ 56

Plaintiff Muhammad A. Aziz, by his undersigned counsel, Shanies Law Office LLC, as and for his complaint against the above-named Defendants, alleges as follows:

**<u>INTRODUCTION</u>**

1.     In February 1965, the New York City Police Department (the "NYPD") arrested Mr. Aziz for the murder of El-Hajj Malik El-Shabazz, also known as Malcolm X – a crime of which Mr. Aziz was innocent.  A judgment of conviction was entered against Mr. Aziz in April 1966 after he was wrongfully convicted of murder in the first degree.

2.     Mr. Aziz, a U.S. Navy veteran who served multiple tours of duty, and the father of six young children, was only 26 years old when he was arrested for the murder of Malcolm X.  He spent 20 years, during what should have been the prime of his life, locked in prison for a crime he did not commit.  The damage done to Mr. Aziz and his family was immense and irreparable.

3.     Mr. Aziz was exonerated over 55 years later in November 2021 after his attorneys, the Shanies Law Office and the Innocence Project, working cooperatively with the New York County District Attorney's Office's ("DANY") Conviction Integrity Program, completed a two-year reinvestigation that conclusively demonstrated Mr. Aziz was wrongfully convicted.

4.     Following the reinvestigation, Mr. Aziz, his co-defendant Khalil Islam,[1] and New York County District Attorney Cyrus R. Vance filed a joint motion under Section 440.10 of the New York Criminal Procedure Law ("CPL") to vacate the judgment of conviction (the "Joint 440 Motion"), on the dual grounds of newly discovered evidence pursuant to CPL Section 440.10(1)(g) and the government's repeated failures to disclose exculpatory evidence.

---

1.   Khalil Islam was named in the indictment as Thomas Johnson and Thomas 15X Johnson, and Mr. Aziz was named in the indictment as Norman Butler and Norman 3X Butler.

5.      As the reinvestigation showed, Mr. Aziz's wrongful conviction was the product of flagrant official misconduct, including, *inter alia*, by the NYPD and its intelligence unit, the Bureau of Special Services and Investigations (also called "BOSS," "BOSSI," and the "Red Squad").

6.      That misconduct led then-District Attorney Vance to "apologize for what were serious, unacceptable violations of law and the public trust."

7.      During the November 18, 2021 hearing on the Joint 440 Motion, District Attorney Vance stated that "there is only one ultimate conclusion; Mr. Aziz and Mr. Islam were wrongfully convicted of this crime."

8.      The Supreme Court of the State of New York, New York County (the "Trial Court") granted the Joint 440 Motion at the hearing, stating, "I regret that this Court cannot fully undo the serious miscarriages of justice in this case and give you back the many years that were lost.  Dismissal of the indictment is the full extent of this Court's authority."  The Trial Court dismissed the indictment against Mr. Aziz.

9.      As a result of his wrongful conviction and imprisonment, Mr. Aziz spent 20 years in prison for a crime he did not commit and more than 55 years living with the hardship and indignity attendant to being unjustly branded as a convicted murderer of one of the most important civil rights leaders in history.

10.     The following sources, among others, caused Mr. Aziz's wrongful conviction: the misconduct of individual Defendants Anthony ("Tony") Bouza, William ("Bill") Knapp, Bernard ("Barney") F. Mulligan, Eugene ("Gene") A. Roberts, Henry Suarez, and Theodore ("Ted") Theologes (collectively, the "BOSSI Agents"); the misconduct of individual Defendants Ferdinand ("Rocky") Cavallaro, Francis ("Frank") Cilento, William E. Confrey, John J. Conroy, Thomas T. Cusmano, Winston W. De Vergee, Sanford Garelik, Joseph Iacovelli, John J. Keeley, Thomas C.

Renaghan, Francis ("Frank") J.M. Robb, James Rushin, Howard G. Schaetzle, Francis M. Sullivan, Warren Taylor, Patrick J. Twomey, Ernest Vohs, and Michael Willis (collectively, the "Case Detectives"); the misconduct of individual Defendants John/Jane Does Numbered 1-50; the unlawful failure by the City of New York (the "City") to prevent its agents' unlawful conduct, including by failing to train, supervise, and discipline its employees; and the City's unlawful policies, customs, and practices that caused violations of the constitutional rights of criminal suspects and defendants, including Mr. Aziz. Mr. Aziz seeks redress for the official misconduct that caused him to spend over 20 years in prison and the mental and physical injuries he sustained while incarcerated, as a result of his false and unlawfully procured conviction.

## **NATURE OF THE ACTION**

11.     This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Mr. Aziz's rights secured by 42 U.S.C. §§ 1983 and 1988 and by the United States Constitution, including its Fourth, Fifth, and Fourteenth Amendments, as well as New York State law, because of Defendants' suppression of information that was material to the determination of Mr. Aziz's innocence or guilt and manufacturing of evidence to prosecute and convict Mr. Aziz for a crime he did not commit. Specifically, the individual Defendants suppressed exculpatory information for the purpose of protecting the BOSSI surveillance machinery, used suggestive identification procedures that were intended to and/or created a high risk of false identifications, and coerced eyewitnesses through threats and promises of favors into making false identifications and giving false testimony.

12.     The lawsuit also seeks to hold Defendant the City of New York liable for the individual Defendants' misconduct under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City maintained unlawful policies, customs, and practices during Mr. Aziz's investigation, arrest, and

trial.  In executing these unlawful policies, customs, and practices, the City violated the constitutional rights of criminal suspects and defendants.  In Mr. Aziz's case, the unlawful policies, customs, and practices enabled the individual Defendants, as well as other members, servants, employees, and agents of the City, to violate Mr. Aziz's constitutional rights.  The policymaking officials acting on behalf of the City of New York were deliberately indifferent to these unlawful policies, customs, and practices.  The City is likewise liable under the doctrine of *respondeat superior* for the tortious conduct of its agents and violations of the New York State Constitution.  As a result, the City of New York is liable for Mr. Aziz's injuries.

## JURISDICTION AND VENUE

13.     This action is brought under 42 U.S.C. §§ 1983 and 1988 in that Mr. Aziz alleges that he was deprived under color of law of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution because of the coercion of false identifications against him; the fabrication of evidence, specifically, the false statements of numerous eyewitnesses before the grand jury and at trial; and the withholding of *Brady* information.[2]

14.     This Court has original subject matter jurisdiction over Mr. Aziz's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Aziz's

---

2.  All references in this complaint to *Brady* and/or exculpatory information refer to the government's obligation under the Due Process Clauses of the Fifth and Fourteenth Amendments to disclose favorable information to a criminal defendant, and corresponding protections under the New York State Constitution.  *See, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995), *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *Giglio v. United States*, 405 U.S. 150, 155 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wilde v. Wyoming*, 80 S. Ct. 900, 901 (1960); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 335 U.S. 28, 31 (1957); *Berger v. United States*, 295 U.S. 78, 88 (1935); *Poventud v. City of New York*, 750 F.3d 121, 133-36 (2d Cir. 2014); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 137 (2d Cir. 1964); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 570-71 (2d Cir. 1961); *United States v. Zborowski*, 271 F.2d 661, 668 (2d Cir. 1959).

constitutional and civil rights, and supplemental jurisdiction over Mr. Aziz's state law claims under 28 U.S.C. § 1367.

15.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Mr. Aziz's claims occurred in this District.

## CONDITIONS PRECEDENT

16.     Mr. Aziz has complied with all conditions precedent to the commencement of this action, having timely served on December 20, 2021 a notice of claim upon the Comptroller of the City of New York, under Section 50-i of the New York General Municipal Law; having waited more than 30 days since said service, without these claims having been settled or otherwise resolved; having had a hearing on March 9, 2022, under Section 50-h of the New York General Municipal Law; and having brought this action in a timely manner.

## PARTIES

17.     Plaintiff Muhammad A. Aziz is a citizen of the United States and was, prior to his incarceration, a resident of Bronx County in the City and State of New York.

18.     Defendant the City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and State of New York, and having the powers and duties imposed by law thereon.

19.     The NYPD and DANY are and were at all relevant times agencies of Defendant the City of New York.  At all times relevant to this action, Defendant the City of New York, by its agents, servants, and employees, was responsible for the operation, maintenance, and control of the NYPD;

the selection, training, supervision, and discipline of police officers; and the training, supervision, and discipline of DANY employees.

20.    Defendant the City of New York was at all times relevant the public employer of the individual Defendants Anthony ("Tony") Bouza, William ("Bill") Knapp, Bernard ("Barney") F. Mulligan, Eugene ("Gene") A. Roberts, Henry Suarez, Theodore ("Ted") Theologes, Ferdinand ("Rocky") Cavallaro, Francis ("Frank") Cilento, William E. Confrey, John J. Conroy, Thomas T. Cusmano, Sanford Garelik, Joseph Iacovelli, John J. Keeley, Thomas C. Renaghan, Francis ("Frank") J.M. Robb, James Rushin, Howard G. Schaetzle, Francis M. Sullivan, Winston W. De Vergee, Warren Taylor, Patrick J. Twomey, Ernest Vohs, Michael Willis, and John/Jane Does Numbered 1-50 and was legally responsible for torts they committed within the scope of their employment or under color of law.  Defendant the City of New York is also obligated under law and by contract to indemnify and defend the individual Defendants named herein.

21.    Defendant Anthony ("Tony") Bouza is a former officer of the NYPD and member of BOSSI.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Lieutenant.  At all relevant times, Defendant Bouza acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Bouza liable in his individual capacity.

22.    Defendant William ("Bill") Knapp is a former officer of the NYPD and member of BOSSI.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Inspector.  At all relevant times, Defendant Knapp acted toward Mr. Aziz under color of law and within the scope of his employment

under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Knapp liable in his individual capacity.

23.     Defendant Bernard ("Barney") F. Mulligan is a former officer of the NYPD and member of BOSSI.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Mulligan acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Mulligan liable in his individual capacity.

24.     Defendant Eugene ("Gene") A. Roberts is a former officer of the NYPD and member of BOSSI.  At all relevant times, he was employed by Defendant the City of New York.  At all relevant times, Defendant Roberts acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Roberts liable in his individual capacity.

25.     Defendant Henry Suarez is a former officer of the NYPD and member of BOSSI.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Suarez acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Suarez liable in his individual capacity.

26.     Defendant Theodore ("Ted") Theologes is a former officer of the NYPD and member of BOSSI.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed

by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Theologes acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Theologes liable in his individual capacity.

27.     Defendant Ferdinand ("Rocky") Cavallaro is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Cavallaro acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Cavallaro liable in his individual capacity.

28.     Defendant Francis ("Frank") Cilento is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Sergeant.  At all relevant times, Defendant Cilento acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Cilento liable in his individual capacity.

29.     Defendant William E. Confrey is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Confrey acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Confrey liable in his individual capacity.

30.     Defendant John J. Conroy is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Conroy acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Conroy liable in his individual capacity.

31.     Defendant Thomas T. Cusmano is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Cusmano acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Cusmano liable in his individual capacity.

32.     Defendant Sanford Garelik is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Chief Inspector.  At all relevant times, Defendant Garelik acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Garelik liable in his individual capacity.

33.     Defendant Joseph Iacovelli is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Iacovelli acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances,

regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Iacovelli liable in his individual capacity.

34.     Defendant John J. Keeley is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Keeley acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Keeley liable in his individual capacity.

35.     Defendant Thomas C. Renaghan is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Assistant Chief Inspector.  At all relevant times, Defendant Renaghan acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Renaghan liable in his individual capacity.

36.     Defendant Francis ("Frank") J.M. Robb is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Inspector.  At all relevant times, Defendant Robb acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Robb liable in his individual capacity.

37.     Defendant James Rushin is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Rushin acted toward Mr. Aziz

under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Rushin liable in his individual capacity.

38.     Defendant Howard G. Schaetzle is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Schaetzle acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Schaetzle liable in his individual capacity.

39.     Defendant Francis M. Sullivan is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Lieutenant.  At all relevant times, Defendant Sullivan acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Sullivan liable in his individual capacity.

40.     Defendant Winston W. De Vergee is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant De Vergee acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant De Vergee liable in his individual capacity.

41.     Defendant Warren Taylor is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York,

holding ranks that included Detective.  At all relevant times, Defendant Taylor acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Taylor liable in his individual capacity.

42.     Defendant Patrick J. Twomey is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Twomey acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Twomey liable in his individual capacity.

43.     Defendant Ernest Vohs is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Vohs acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Vohs liable in his individual capacity.

44.     Defendant Michael Willis is a former officer of the NYPD.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding ranks that included Detective.  At all relevant times, Defendant Willis acted toward Mr. Aziz under color of law and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Willis liable in his individual capacity.

45.     Defendants John/Jane Does Numbered 1-50 are officers and/or supervisors in the NYPD who acted toward Mr. Aziz under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York; and who participated in the misconduct alleged herein; but whose actual names Mr. Aziz has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John/Jane Does Numbered 1-50 liable in their individual capacities.

## JURY DEMAND

46.     Mr. Aziz hereby demands trial by jury of all issues raised in this complaint.

## FACTS

**A.     The Crime and Muhammad Aziz's Innocence**

47.     On February 21, 1965, at approximately 3:00 p.m., Malcolm X was introduced to speak at the Audubon Ballroom in New York City.

48.     As Malcolm X began his remarks, a group of men in the audience orchestrated a distraction by pretending to fight over a pickpocketing attempt and throwing an improvised smoke bomb into the crowd.

49.     Amid the resulting confusion, three men ambushed Malcolm X, shooting and fatally wounding him.

50.     First, William Bradley,[3] a former Lieutenant in the Nation of Islam (the "NOI") Mosque No. 25 in Newark, New Jersey, shot Malcolm X with a sawed-off, 12-gauge JC Higgins brand shotgun.

---

3.   William Bradley was later known as Al-Mustafa Shabazz.

51.     Shortly thereafter, two former members of NOI Mosque No. 76 in Paterson, New Jersey – Mujahid Abdul Halim,[4] who fired a .45 caliber semiautomatic pistol, and Leon Davis, who fired a 9mm semiautomatic pistol – shot Malcolm X repeatedly as he lay prone on the stage.

52.     All the gunmen fled, but Halim was captured at the scene by a group of civilians and arrested by the NYPD.

53.     Co-conspirators Benjamin Thomas, a former Assistant Secretary of Mosque No. 76 in Paterson, New Jersey, and a man known as Wilbur Kinly, a former member of Mosque No. 25 in Newark, New Jersey, were also present.  One or both of those men created the distraction in the crowd to divert attention from the shooters, and Kinly threw onto the Ballroom floor an improvised smoke bomb made by Halim.

54.     The .45 caliber semiautomatic pistol used by Halim was recovered later that day from a Ronald Timberlake, who had picked up the weapon after Halim dropped it; brought it back to his home in Brooklyn, New York; and disassembled it.  Hours later, Timberlake contacted the New York Office of the Federal Bureau of Investigation (the "FBI" or "Bureau") and arranged to give them the gun.  The FBI turned the gun over to the NYPD.

55.     The shotgun and 9mm semiautomatic pistol used by the two other gunmen were retrieved by a man named Charles Blackwell.  Blackwell later testified before the grand jury that he wrapped the guns in coats and gave them to Reuben Francis and "Brother [Gene]," although he testified differently at trial.

56.     At the time of the attack on Malcolm X, Mr. Aziz was at his home at 661 Rosedale Avenue, Bronx, New York.  He had nothing whatsoever to do with the crime.

---

4.  Mujahid Abdul Halim was alternatively known as Talmadge Hayer, Thomas Hayer, Thomas Hagan, and Thomas Hagen.

57.     Mr. Aziz spent most of that day tending to his legs, which had been wounded in a beating a month prior by police officers.

58.     At the time of Malcolm X's murder, the injuries to his legs prevented Mr. Aziz from being able to run or even walk without limping and substantial pain.

59.     As evidenced by hospital records, Mr. Aziz went to Jacobi Hospital on the morning of February 21st due to pain in his right leg and was treated in the emergency room.  The attending physician, Dr. Kenneth Seslowe, M.D., wrapped Mr. Aziz's wounded leg, prescribed medication, and instructed him to elevate and rest his leg.

60.     Mr. Aziz returned to his home in the Bronx sometime before 1:00 p.m. and remained there for the rest of the day, resting his leg as the doctor had instructed.

61.     While at home with his family, Mr. Aziz had a series of telephone calls at or around 3:00 p.m. about the recently announced news of Malcolm X's shooting.  This included incoming calls from Gloria Wills and Juanita Gibbs, friends of Mr. Aziz's then-wife.  Both women spoke to Mr. Aziz and therefore were able to confirm that he was at his home in the Bronx at the time of the crime.

62.     In addition, Mr. Aziz exchanged calls with Mosque No. 7 in Manhattan shortly after hearing news of the shooting at the Audubon Ballroom.  Among those calls, J.M., a former member of Mosque No. 7, called Mr. Aziz at his home and spoke to him, thereby confirming that Mr. Aziz was at his home in the Bronx at the time of the crime.

**B.      The Investigation and Suppression of Exculpatory Information**

63.     The NYPD led the investigation of the murder of Malcolm X, with considerable assistance from the FBI.  The majority of the investigation occurred in Brooklyn, Queens, Manhattan, and the Bronx, but the investigation extended into other states and judicial districts.

64.     Among the NYPD Case Detectives, the lead detectives assigned to the case were Defendants Cavallaro, Confrey, Conroy, Cusmano, Iacovelli, Keeley, Rushin, and Schaetzle; and

their supervisors, Defendants Cilento, Garelik, Renaghan, Robb, and Sullivan (collectively, the "Lead Detectives").

65.     Defendants De Vergee, Taylor, Twomey, Vohs, and Willis (collectively, the "Assisting Detectives") assisted with the investigation, including the custody, transport, interrogation, and preparation of witnesses and potential witnesses to give statements and/or take part in identification procedures.

66.     Each of the Lead Detectives was aware of the exculpatory information and eyewitness-related police misconduct described herein, with the exception of information concealed by BOSSI.

67.     Each of the Assisting Detectives was aware of evidence of third-party guilt, including other suspects, and some or all of the eyewitness-related misconduct, including the coercion and bribery of witnesses and the knowing use of improper and unlawful identification procedures.

68.     The NYPD and FBI worked in close tandem throughout the investigation and prosecution of the case, and there was extensive cooperation and sharing of information.

69.     For example, numerous eyewitnesses, both testifying and non-testifying, were FBI informants who were sent to the NYPD by their FBI contacts.  The FBI coordinated these informants' cooperation with the NYPD.

70.     The FBI likewise coordinated Ronald Timberlake's cooperation with the NYPD investigation, leading to the recovery of one of the murder weapons in Brooklyn.  An FBI agent delivered the murder weapon to the NYPD along with Timberlake, and both the agent and Timberlake later testified at trial.

71.     The FBI and the NYPD established a liaison system of higher-ranking officers to exchange information.  Early in the investigation, the FBI invited the NYPD's collaboration on developing investigative leads outside of New York.

72.     The FBI provided the NYPD with the identities of individuals its agents identified as having been present in the Audubon Ballroom at the time of the murder.  NYPD detectives from BOSSI also participated in certain interviews with FBI agents.  Both the NYPD and the FBI, at each other's request, conducted research and shared information about persons of interest, including at least three of the five known assassins (Bradley, Davis, and Halim).

73.     Together, the NYPD and FBI amassed an immense volume of intelligence and investigative reports pointing away from Mr. Aziz and demonstrating that the actual perpetrators came from New Jersey and were affiliated with the NOI mosques in Newark and Paterson, New Jersey.

74.     The NYPD and FBI likewise obtained detailed descriptions of two suspects, including the shotgun assassin later falsely identified as Mr. Islam, who was described as: "a negro male, age twenty eight, six feet two inches, two hundred pounds, heavy build, dark complexion, wearing [a] gray coat and believed to be [the] assailant who used [the] shotgun."

75.     Over the next few weeks, the Lead Detectives and Assisting Detectives became aware of another informant who corroborated this description of the shotgun assassin – a description that matched Bradley and not Mr. Islam.

76.     The FBI disclosed to the Lead Detectives exculpatory information from a Boston-based informant, including his description of the assailant with the shotgun and the assailant's connection to the Newark mosque.

77.     The FBI exchanged with Defendants Mulligan and Theologes exculpatory information concerning Bradley and Davis.  Mulligan and Theologes shared said information with Defendants Bouza, Knapp, and Suarez.  None of these Defendants disclosed such information to the defense.

78.     Intelligence the NYPD and FBI collected included the names of all three shooters (Bradley, Davis, and Halim) and co-conspirator Thomas, the specific locations where the men were sitting in the Ballroom, and physical descriptions of the assassins.

79.     Numerous NYPD and FBI informants and undercover officers witnessed the murder of Malcolm X.  That included Defendant Roberts, who was at the time posing as a security guard for Malcolm X, while secretly working as an undercover officer for the BOSSI unit of the NYPD.

80.     As a member of the rostrum security team on the day of Malcolm's murder, Roberts observed two of the shooters seated in the front row of the Audubon Ballroom and saw the three shooters run in the same direction, toward the back of the Ballroom.  Two of the shooters ran past Roberts, and Roberts physically engaged the third (Hayer).

81.     Through Roberts, the NYPD became aware that the men who shot Malcolm X sat in the front row of the Audubon Ballroom.  Defendants Bouza, Knapp, Mulligan, Suarez, and Theologes, among others, learned of the exculpatory information in Defendant Roberts's possession.  None of these Defendants disclosed such information to the defense.

82.     In addition to Roberts's observations, both the NYPD and the FBI had intelligence from other sources that placed the shooters in the front row of the Audubon.

83.     Despite the significant exculpatory value of the information described above, none of this information was disclosed to the defense at trial.  Instead, both the NYPD and FBI knowingly suppressed this information from Mr. Aziz, the court, and, in many cases, the prosecution.

84.     The detectives conducted their investigation under the hypothesis that the perpetrators were Black men associated with the NOI.

85.     The NYPD Case Detectives were under immense pressure from their superiors and others to arrest and charge at least two persons with the murder of Malcolm X and to do so quickly.

86.     Mr. Aziz and Mr. Islam made attractive targets to the Case Detectives because both were known to the NYPD as Black men associated with the NOI; both were lieutenants in NOI Mosque No. 7; and both men were home, as opposed to at the mosque, at the time of the murder.

87.     The Lead Detectives used threats, promises of benefits, and other forms of coercion to induce numerous individuals to falsely identify Mr. Aziz and Mr. Islam as two of the men who fired guns at Malcolm X on February 21st.

88.     The Assisting Detectives witnessed the foregoing, frequently failing to document the misconduct, and in all cases failing to cause the disclosure of the misconduct to the defense.

89.     The Lead Detectives employed identification procedures they knew were improper and created a substantial risk of causing a false identification.

90.     The Assisting Detectives witnessed the foregoing, frequently failing to document the misconduct, and in all cases failing to cause the disclosure of the misconduct to the defense.

91.     As a non-exhaustive example, Defendants Cavallaro, Cilento, Conroy, Cusmano, De Vergee, Keeley, Schaetzle, and Twomey, acting individually and in concert with one another and others not named herein, met repeatedly with witness Cary Thomas; urged him to identify Mr. Aziz and Mr. Islam as perpetrators in the shooting of Malcolm X; threatened him; promised to assist him with criminal and civil matters in return for his cooperation; provided him with money, shopping trips, and other benefits in return for his cooperation; caused him to be detained pursuant to a material witness order; repeatedly removed him from custody for the purposes of currying favor with him and ensuring his cooperation; showed him photographs of Mr. Aziz and Mr. Islam prior to identification procedures and/or to trial; and prepared him to falsely identify Mr. Aziz and Mr. Islam, including before the grand jury and at trial.

92.     As another non-exhaustive example, Defendants Cavallaro, Cilento, Conroy, Keeley, Twomey, and Vohs, acting individually and in concert with one another and others not named herein, met repeatedly with witness Vernal Temple; urged him to identify Mr. Aziz and Mr. Islam as perpetrators in the shooting of Malcolm X; threatened him; showed him photographs of Mr. Aziz and Mr. Islam prior to identification procedures and/or to trial; fed him false facts to recite in testimony against Mr. Aziz and Mr. Islam; and prepared him to falsely identify Mr. Aziz and Mr. Islam, including before the grand jury and at trial.

93.     As another non-exhaustive example, Defendants Cavallaro, Confrey, Cilento, and Keeley, acting individually and in concert with one another and others not named herein, met repeatedly with witness Edward DePina[5]; urged him to identify Mr. Aziz as a perpetrator in the shooting of Malcolm X; promised to assist him with criminal and civil matters in return for his cooperation; threatened him; showed him photographs of Mr. Aziz prior to identification procedures and/or to trial; fed him false facts to recite in testimony against Mr. Aziz; and prepared him to falsely identify Mr. Aziz, including before the grand jury and at trial.

94.     As another non-exhaustive example, Defendants Cavallaro, Keeley, and Willis, acting individually and in concert with one another and others not named herein, met repeatedly with witness Fred Williams; urged him to identify Mr. Aziz and Mr. Islam as perpetrators in the shooting of Malcolm X; showed him photographs of Mr. Aziz and Mr. Islam prior to identification procedures and/or to trial; fed him false facts to recite in testimony against Mr. Aziz and Mr. Islam; and prepared him to falsely identify Mr. Aziz and Mr. Islam, including before the grand jury and at trial.

95.     As another non-exhaustive example, Defendants Cavallaro, Cilento, Garelik, Keeley, Taylor, and Vohs, acting individually and in concert with one another and others not named herein,

---

5.   DePina's last name is spelled alternatively in the trial record as "DiPina."

met repeatedly with witness Jasper Davis; urged him to identify Mr. Aziz as a perpetrator in the shooting of Malcolm X; showed him photographs of Mr. Aziz prior to identification procedures and/or to trial; fed him false facts to recite in testimony against Mr. Aziz; and prepared him to falsely identify Mr. Aziz, including before the grand jury and at trial.

96.     As another non-exhaustive example, Defendants Cavallaro, Cilento, Conroy, Iacovelli, Keeley, and Sullivan, acting individually and in concert with one another and others not named herein, met repeatedly with witness Ronald Timberlake; urged him to identify Mr. Aziz as a perpetrator in the shooting of Malcolm X; offered him monetary and other benefits in return for his cooperation; promised to assist him with criminal and civil matters in return for his cooperation; threatened him; showed him photographs of Mr. Aziz prior to identification procedures and/or to trial; fed him false facts to recite in testimony against Mr. Aziz; and prepared him to falsely identify Mr. Aziz, including before the grand jury and at trial.

97.     As another non-exhaustive example, Defendants Cavallaro, Cilento, Keeley, Rushin, and Taylor, acting individually and in concert with one another and others not named herein, met repeatedly with witness Charles Blackwell; urged him to identify Mr. Aziz and Mr. Islam as perpetrators in the shooting of Malcolm X; threatened him; promised him assistance with criminal and civil matters in exchange for his cooperation; showed him photographs of Mr. Aziz and Mr. Islam prior to identification procedures and/or to trial; fed him false facts to recite in testimony against Mr. Aziz and Mr. Islam; and prepared him to falsely identify Mr. Aziz and Mr. Islam, including before the grand jury and at trial.

98.     As another non-exhaustive example, Defendants Cavallaro, Cusmano, Conroy, Cilento, De Vergee, Keeley, Schaetzle, and Twomey, acting individually and in concert with one another and others not named herein, met repeatedly with witness Leon Ameer, also known as Leon

4X and Leon Phillips, Jr., whereby they received *Brady* information, including, but not limited to, a description of one or more perpetrators and information about the involvement of the Newark, New Jersey mosque, which they shared with Defendants Cilento, Garelik, Renaghan, Robb, and among others.

99.     As another non-exhaustive example, Defendants Cavallaro, Cilento, Cusmano, Keeley, and Twomey, acting individually and in concert with one another and others not named herein, met repeatedly with witness Benjamin Karim, also known as Benjamin 2X and Benjamin Goodman, whereby they received *Brady* information, including, but not limited to, the account of a percipient witness who attested to the fact that neither Mr. Aziz nor Mr. Islam was present in the Audubon Ballroom on February 21, 1965, which they shared with Defendants Cilento, Garelik, Renaghan, Robb, and among others.

100.     As another non-exhaustive example, Defendant Cilento, acting individually and in concert with others not named herein, met one or more times with witness Earl Grant, whereby he received *Brady* information, including, but not limited to, the account of a percipient witness who recognized a number of persons involved in the murder of Malcolm X, including Benjamin Thomas, which he shared with Defendants Cavallaro, Cilento, Keeley, Garelik, Renaghan, Robb, and among others.

101.     Defendants De Vergee, Taylor, Twomey, Vohs, and Willis communicated the exculpatory information of which they became aware during the investigation to Defendants Cavallaro, Confrey, Conroy, Cusmano, Iacovelli, Keeley, Rushin, and Schaetzle, who in turn communicated that information to Defendants Cilento, Garelik, Renaghan, Robb, and Sullivan.

### C.     The Arrest, Trial, and Conviction

102.     On February 26, 1965, one or more of the NYPD Case Detectives arrested Mr. Aziz at his home for the murder of Malcolm X.

103.    At trial, Mr. Aziz testified in his defense, affirming that he was innocent and was at home with his family at the time of the crime.  He further testified that he was in no way involved in the assassination, that he was not at the Audubon Ballroom on February 21, 1965, and that he had never in his life seen Halim prior to his arrest.

104.    Mr. Aziz also presented testimony from his wife and friends who either saw or called him at his home around the time of the murder.

105.    Mr. Aziz presented testimony from the physician who treated him in the emergency room for leg injuries on the morning of February 21st.

106.    Additionally, Mr. Aziz presented testimony from Ernest Greene, a young man from Queens who witnessed the shooting and saw the shotgun assassin, whom he described as "stout and very dark and had a very deep beard" – an accurate description of William Bradley, not Mr. Islam (nor, for that matter, Mr. Aziz).

107.    Finally, following earlier testimony in which he denied guilt, Halim insisted on returning to the stand and testifying for Mr. Aziz.  Halim recanted his previous testimony, confessed his guilt, and affirmed the innocence of his two co-defendants, Mr. Aziz and Mr. Islam.  Upon retaking the stand, Halim testified that he was speaking of his own free will because "I just want to tell the truth, that's all."

108.    Halim testified that he did not know Mr. Aziz or Mr. Islam before they became his co-defendants, and that neither of them had any involvement with the murder of Malcolm X.

109.    The Lead Detectives and BOSSI Agents possessed information and evidence corroborating this testimony by Halim, along with other *Brady* information.

110.    Halim admitted that he shot Malcolm X with a .45 caliber handgun.

111.    Halim testified that four other men were involved in the murder, that he knew all of them, and that he refused to identify them.

112.    Halim testified that he and another man sat in the front row armed with pistols, that another man sat a few rows back "with the shotgun," and that a "man in the back" started a "commotion" by pretending his pocket was being picked.

113.    Halim described the shotgun assassin as "husky" with "dark skin" and a beard – again, an accurate description of William Bradley, not Mr. Islam (nor, for that matter, Mr. Aziz).  Halim refused to describe the others.

114.    The Lead Detectives and BOSSI Agents possessed information and evidence corroborating this testimony by Halim, along with other *Brady* information.

115.    There is not and never was any physical or forensic evidence linking Mr. Aziz to the shooting.  Nor was there any evidence of Mr. Aziz having any connection to Mr. Halim, or even having ever met him.  Nor was Mr. Aziz caught at or anywhere near the crime scene.

116.    The prosecution's case against Mr. Aziz rested entirely on eyewitness testimony, the relevant portions of which were procured through the Lead Detectives' and others' use of coercion, threats, bribery, and identification procedures known to be improper and to create a substantial risk of a false identification.

117.    Various witnesses prepared by Defendants and others purported to place the shooters of Malcolm X in various parts of the Audubon Ballroom, but none of them placed the shooters in the front row.  The only trial witness who testified that the shooters sat in the front row was Halim.

118.    The BOSSI Agents possessed information and evidence corroborating this testimony by Halim, along with other *Brady* information.

119.     The jury heard that the prosecution witnesses had picked Mr. Aziz out of lineups or from photographs during the investigation, but the manner in which the police conducted such procedures was never presented to the jury or the court.

120.     In fact, the manner in which the police conducted identification procedures was highly improper, and the Lead Detectives knowingly used suggestive and/or outright coercive identification procedures that were intended to cause and/or created a substantial risk of false identifications of Mr. Aziz and Mr. Islam.

121.     The improper and suggestive identification procedures used by the Lead Detectives included, *inter alia*:

    a.   showing witnesses photographs of Mr. Aziz prior to the photo arrays and/or lineups;

    b.   suggesting and even explicitly telling witnesses prior to the photo arrays and/or lineups that Mr. Aziz was a suspect;

    c.   instructing witnesses to select Mr. Aziz from the photo arrays and/or lineups;

    d.   composing photo arrays and/or lineups with too few fillers;

    e.   composing photo arrays and/or lineups that impermissibly highlighted Mr. Aziz and/or distinguished him from the other participants, including by presenting Mr. Aziz in unique articles of clothing and by selecting fillers of different races and sizes and with other different physical characteristics than Mr. Aziz;

    f.   trying to bolster identifications by having the same witness participate in multiple suggestive identification procedures including Mr. Aziz; and

    g.   failing to maintain and/or destroying documentation of any photo array or lineup that the Lead Detectives conducted, the methods they used to conduct any identification procedures, what the police and/or prosecutors said to witnesses prior to their identifications of Mr. Aziz, or what interactions or communications they had with such witnesses following the identifications.

122.     The Case Detectives engaged in yet more misconduct by fabricating evidence, namely, by coercing witnesses to make false identifications and give false testimony against Mr. Aziz before the grand jury and at trial.

123.    The Case Detectives coerced such witnesses by, *inter alia*:

    a.  manipulating and lying to witnesses;

    b.  feeding witnesses both actual details uncovered through the investigation as well as false facts;

    c.  threatening witnesses, including by arresting and imprisoning them pursuant to material witness orders; and

    d.  promising and bestowing benefits in exchange for the witnesses' false identifications and testimonies.

124.    The individual Defendants disclosed to one another the existence of the *Brady* information and documents described above, including evidence implicating the New Jersey killers; other evidence of third-party guilt; evidence of improper and unlawful identification procedures; evidence of witness intimidation, bribery, and coercion; and evidence that would have materially impeached the testimony of one or more trial witnesses; but said Defendants failed to disclose that information to Mr. Aziz, Mr. Islam, their representatives, the Court, and, in many cases, the prosecution.

125.    At trial, a tremendous amount of evidence of Mr. Aziz's innocence – including documents and information from undercover officers and informants – was suppressed and hidden from the defense, from the court, and, in many cases, from the prosecution.

126.    At the conclusion of the trial, Mr. Aziz was wrongfully convicted of one count of murder in the first degree.

127.    The judgment of conviction was entered under Indictment No. 871/1965 in the Trial Court.

128.    On April 14, 1966, the Trial Court sentenced Mr. Aziz to life imprisonment.  He began serving the sentence immediately.

**D.     The 1970s Post-Conviction Proceedings and Discovery of Exculpatory Information Withheld from the Defense**

129.    In December 1977, Mr. Aziz moved to vacate his conviction, primarily on the grounds of newly discovered evidence under CPL Section 440.10(1)(g) (the "1977 440 Motion").

130.    The 1977 440 Motion was predicated chiefly on: (1) affidavits from Halim, identifying his true co-conspirators; (2) the revelation that Defendant Roberts, an undercover NYPD officer, had witnessed Malcolm X's assassination; (3) an affidavit from Benjamin Karim, Malcolm X's assistant minister who spoke to the audience in the Audubon Ballroom immediately before Malcolm on February 21, 1965; and (4) certain redacted FBI records obtained during the pendency of the post-conviction proceedings.

### *1.    Mujahid Abdul Halim's Affidavits*

131.    In his affidavits dated November 30, 1977 and February 25, 1978, Halim identified his fellow assassins as Benjamin Thomas, Leon Davis, "William X,"[6] and "Wilbur or Kinly."

132.    Halim averred that all four men were NOI members from New Jersey.  Thomas and Davis – both of whom Halim knew "well" – lived in Paterson and were associated with Mosque No. 76 in Paterson.  "William X" and "Wilbur" both lived in Newark and were associated with Mosque No. 25 in Newark.

133.    Halim described in detail the murder plot, his recruitment to the plot, the planning of the murder, and each assassin's role.  Halim explained that he and Davis sat in the front row of the Audubon Ballroom, with Bradley and Thomas sitting close behind them and Kinly in the rear of the Ballroom.

---

6.   By the time Mr. Aziz filed a petition on or around December 31, 1979 for a writ of habeas corpus, William X's last name was identified as "Bradley."

27

134.    The individual Defendants and others continued to suppress a large volume of NYPD and FBI documents and information corroborating many details set forth in Halim's affidavits.

### 2.    *The Revelation of Defendant Roberts's Identity and Some of His Knowledge*

135.    Defendant Roberts's identity as an undercover NYPD officer and the fact that he witnessed Malcolm X's murder were first publicly revealed during his testimony in an unrelated case in 1970.

136.    When questioned about Malcolm X's murder, Roberts testified that he was working undercover as a member of Malcolm's "rostrum security" and was relieved from his post just before Malcolm took the stage.

137.    Roberts testified that "two individuals near the front of the auditorium jumped up" to create the distraction, and as Roberts "started down the aisle" toward them, gunfire erupted.  Roberts further testified that he came face to face with Halim, who shot at him but missed, and that he hit Halim with a chair, knocking him down.

138.    In response to Mr. Aziz's 1977 440 Motion, in January 1978, Roberts provided an affidavit, submitted by DANY, denying his or the NYPD's involvement in Malcolm X's assassination and averring that he did "not have any information" or reason to believe Mr. Aziz was innocent.

139.    Among other information that Roberts and the NYPD suppressed at that time was that Roberts saw the shooters seated in the *front row* of the Audubon Ballroom.

### 3.    *Benjamin Karim's Affidavit*

140.    Meanwhile, in his affidavit, the minister Karim swore that he was certain Mr. Aziz, whom he "knew well," had not been at the Audubon Ballroom on February 21, 1965.

141.    Karim wrote that because he spoke to the audience at length, he had an opportunity to "observe the faces of all the people in the crowd," and he did not see Mr. Aziz.

142.    He added that Mr. Aziz was known to Malcolm X's security team and would not have been allowed into the Ballroom without drawing scrutiny.

143.    Numerous individual Defendants, including, but not limited to Defendants Cavallaro, Cilento, Cusmano, Garelik, Keeley, Renaghan, Robb, Sullivan, and Twomey, had possessed the same or materially similar information about Karim's exculpatory account since 1965 but suppressed that information.

### 4. *The New York County District Attorney's Office's Opposition and Trial Court's Decision*

144.    In opposing the 1977 440 Motion, DANY represented to the court that "[t]he District Attorney's Office case file contains nothing which supports any of the defendant's allegations or contentions.  Specifically, *there is no mention or indication of, or reference to, any of the persons identified by* [*Halim*] in his affidavits as having been his accomplices in the murder of Malcolm X."

145.    DANY further represented to the court that "[t]he District Attorney's Office case file contains no papers of any kind from the Federal Bureau of Investigation," and that any information in the FBI records obtained by the defense had no significance:

> There is nothing in any of these unredacted FBI documents which in any way supports any of the defendants' contentions or allegations. Specifically, *there is no mention or indication of the name of, or reference to, any of the persons identified by* [*Halim*] in his affidavits as having been his accomplices in the murder of Malcolm X.

146.    In a decision dated November 1, 1978, Justice Harold Rothwax denied the 1977 440 Motion.

147.    Justice Rothwax wrote that he "must question the reliability of any identification which comes thirteen years after the events in question to inculpate persons who apparently were never the object of suspicion despite the thorough efforts of local, state and federal law enforcement officials."

148.    He rejected Mr. Aziz's request for an order requiring the District Attorney to investigate, adding:

> The district attorney has an obligation to the fair administration of public justice independent of the authority of this court. His is the prosecutorial discretion . . . .  Were there reliable evidence which tended to support the conclusions that petitioners suggest, this court is confident that the district attorney would undertake to ensure that no miscarriage of justice had occurred.

### E.    The Joint Reinvestigation and Discovery of Additional Exculpatory Information Withheld from the Defense

149.    In January 2020, counsel for Mr. Aziz and Mr. Islam began a joint reinvestigation of the case with DANY's Conviction Integrity Program.

150.    The investigation unearthed substantial and compelling new evidence of Mr. Aziz and Mr. Islam's innocence.

151.    This included, *inter alia*, information about Halim and his co-conspirators Benjamin Thomas, William Bradley, and Leon Davis; information about Defendant Roberts; information undermining the trial testimony of prosecution witnesses; and information corroborating Mr. Aziz's alibi.

152.    A significant portion of the new evidence had been in the possession of the NYPD and/or FBI soon after Malcolm X's assassination and well in advance of trial but was never disclosed to Mr. Aziz or Mr. Islam prior to trial, their convictions, or, for the most part, the 1970s post-conviction proceedings.

153.    Among the newly discovered evidence that had been withheld from the defense was undercover officer Roberts's account of the murder, in which he revealed that the shooters sat in the front row of the Audubon Ballroom, and an FBI report placing the shooters in "the front seats, left side of [the] middle aisle."  This evidence corroborated Halim's testimony and contradicted the account of every purported eyewitness the prosecution presented at trial.

154.    Roberts reported his observations to his BOSSI handlers, but BOSSI, evidently believing that protecting the identity of its undercover asset was too important, made the decision not to reveal the information to anyone outside its covert unit.  Instead, pursuant to the NYPD's policies and established practices at the time, Roberts's identity and the intelligence he generated were strictly compartmentalized – kept secret even within the NYPD.  As a result, not even the prosecution – much less the court, the defense, or the public – knew about Roberts or what he saw on February 21, 1965.

155.    Other evidence corroborating key details of Halim's testimony was the crucial initial account of prosecution witness Charles Blackwell.  This account, which contradicted Blackwell's later trial testimony, was memorialized in an NYPD report (the "Blackwell Report") but hidden from the defense for more than 55 years, before being uncovered during the recent conviction integrity reinvestigation.

156.    The Blackwell Report provided a detailed description of events preceding Malcolm X's murder.  Blackwell, a member of the Jersey City mosque, told an NYPD informant that he "was stationed on the left side of the rostrum looking at the stage."  Blackwell saw "a fellow named Linwood from Plainfield[,] N.J.," who sat "in the front row on the right side."  Meanwhile, "two other men who had entered with [Linwood] separate[d from him] and s[a]t on the left front row of chairs" – the precise location where Halim said he and Davis sat.  Blackwell reported that he felt the men were staring at him because they recognized him.  He later heard the commotion in the audience, "and then the shooting started."

157.    Blackwell told the informant that he "feels" he saw Islam in the Ballroom, though he ascribed to him no role in the shooting.  Of critical importance, Blackwell reported that "[t]he two suspects in the front then began to fire their guns."  Blackwell "also noticed another person who he knows as Benjamin from Paterson or Newark seated about the third row on the left side."  That

matches Halim's account: that Benjamin Thomas, from Paterson, sat on the left side of the Ballroom, a few rows behind Halim, who sat in the front row.

158.    The NYPD suppressed yet more information about Halim's co-conspirators.   For example, just three months after the murder, the NYPD discussed William Bradley with the FBI, and FBI Special Agent August "Gus" J. Micek ran searches on Bradley through BOSSI and the NYPD's Bureau of Criminal Identification.

159.    Another FBI report discusses intelligence that the FBI and NYPD collected on Leon Davis.  The report states that 11 days after the murder, an NYPD homicide lieutenant advised the FBI that it was seeking an associate of Halim's who was known as "Turk" and "who was supposed to have been with [Halim] three weeks before Malcolm X[']s death."   The FBI's Newark Office immediately identified "Turk" as "Leon Davis" – the third shooter, along with Halim and Bradley.

160.    Several NYPD reports indicate that the NYPD also suppressed information about alternative suspects.  The full extent of the NYPD's suppression of *Brady* information remains to be determined.

161.    The previously unavailable evidence uncovered during the joint reinvestigation is exculpatory.  Had such information been disclosed in a timely fashion – or even after Halim came forward with the identities of and other information about his co-conspirators – Mr. Aziz and Mr. Islam would not have been arrested or convicted.

**F.      The Joint Motion to Vacate and Trial Court's Decision**

162.    Following the reinvestigation, on November 18, 2021, Mr. Aziz, Mr. Islam, and District Attorney Vance filed the Joint 440 Motion to vacate Mr. Aziz's and Mr. Islam's judgments of conviction on the grounds of newly discovered evidence, pursuant to CPL Section 440.10(1)(g), and of the failure to disclose exculpatory evidence, pursuant to *Brady*.  In the Joint 440 Motion,

they also moved to dismiss the indictment against Mr. Aziz and Mr. Islam pursuant to CPL Section 210.40.

163.    During a hearing on the Joint 440 Motion, District Attorney Vance expressly stated that "there is only one ultimate conclusion; Mr. Aziz and Mr. Islam were wrongfully convicted of this crime."

164.    The Trial Court granted the Joint 440 Motion at the hearing.

165.    In doing so, the Trial Court observed that "there can be no question that this is a case that cries out for fundamental justice."

166.    The Trial Court continued, "I regret that this Court cannot fully undo the serious miscarriages of justice in this case and give you back the many years that were lost.  Dismissal of the indictment is the full extent of this Court's authority."

167.    The Trial Court vacated Mr. Aziz's and Mr. Islam's convictions, dismissed the indictment against them, and sealed the case with respect to both men.

### G.    The City of New York's Deliberate Indifference to Official Misconduct; *Brady* Violations; and Failure to Train, Supervise, and Discipline its Employees

168.    Mr. Aziz's wrongful conviction and imprisonment were not a random miscarriage of justice in an otherwise functioning law enforcement regime.  Rather, during the relevant period, policymakers acting on behalf of Defendant the City of New York engaged in the following misconduct, which was reflected, and led to the false conviction, in Mr. Aziz's case: acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; and implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of City officials – including, but not limited to, properly documenting and disclosing exculpatory information, and not to fabricate evidence by causing witnesses to make false identifications and/or give false testimony.

1. ***The Fragmentation of the NYPD and BOSSI's Policies, Customs, and Practices of Suppressing* Brady *Evidence***

169.    At the time of Mr. Aziz's arrest and conviction, Defendant the City of New York was plagued by institutional deficiencies and corruption that allowed a wanton and reckless culture to develop within the NYPD and, in particular, BOSSI.  This culture allowed employees of the NYPD to violate constitutional rights of the citizens of the City of New York without disciplinary risk or repercussions.

170.    BOSSI was variously known as the "Bureau of Special Services and Investigations," the "Bureau of Special Services" (its name in 1965), the "Special Services Division," and "Special Intelligence Services."  It began as the "Red Squad," a unit meant to target communists during the McCarthy era, before expanding its investigations to include other groups perceived to be a threat or enemy of the status quo.

171.    As an intelligence gathering unit, BOSSI infiltrated, conducted countermeasures, and spied on individuals and political and social groups.  Its list of targets in the 1960s included Malcolm X and the NOI.  Its practices included committing forgeries, sending poison pen letters, and undertaking other efforts to foment conflict within groups.

172.    During the relevant period, neither the City nor the NYPD implemented adequate rules or regulations to ensure that BOSSI operated within the confines of the law.  BOSSI had a nebulous mandate, virtually no limiting operational standards, and no independent audits or other procedures in place for external review.

173.    With no guidelines or restraints in place to curb its clandestine operations, BOSSI was an instrument of abuse that freely and routinely engaged in dirty tactics.  Among other things, it: (1) infiltrated entire communities despite there being no evidence of criminal activity warranting such sweeping or protracted surveillance; (2) engaged in unlawful electronic surveillance, searches, and

seizures; (3) provoked and induced individuals to commit crimes; (4) maintained and indiscriminately disseminated political dossiers on individuals and groups engaged in legal conduct; (5) spread false information intended to cause dissension; and (6) suppressed exculpatory information about persons subject to criminal investigations and/or prosecutions.

174.   BOSSI operated under extreme secrecy, and both BOSSI and the NYPD went to great lengths to ensure such secrecy.  The NYPD traditionally refused to acknowledge even the existence of the unit.  Undercover agents were recruited outside of New York, secretly inducted, and trained outside of the Police Academy.  They were not listed as BOSSI or NYPD operatives on any official roster, salary chart, or budget.  They did not appear on any official record connecting them to the NYPD.  Identities of fellow BOSSI agents, even those of agents working the same assignment or targeting the same target, were withheld from one another.  Undercover agents reported to different offices, on different days of the week, in different parts of the city.

175.   BOSSI and the NYPD's efforts to conceal the unit knew no bounds, even if it meant violating the law.  Indeed, as a matter of policy, custom, and practice, BOSSI and the NYPD suppressed exculpatory information from the defense (and, in certain cases, from the prosecution) to protect the BOSSI surveillance machinery and the identities of its undercover agents.

176.   To maintain its secrecy, BOSSI was intentionally siloed off from the rest of the NYPD, and the sharing of information was heavily curtailed, even where the law required it.

177.   The very structure and organization of BOSSI were intended to insulate it from the rest of the NYPD.  During the relevant period, BOSSI was headquartered in a separate building far removed from other police offices, in part to shield it from departmental, press, and public scrutiny. Additionally, BOSSI was headed by a deputy inspector who reported directly to the first deputy commissioner, bypassing typical lines of reporting within the police department.

178.     BOSSI's fragmentation from the rest of the NYPD was examined by the Commission to Investigate Allegations of Police Corruption and the City's Anti-Corruption Practices (also known as the Commission to Investigate Alleged Police Corruption and informally as the Knapp Commission, after its chairman, the Honorable Whitman Knapp).

179.     The Knapp Commission was a five-member panel established in May 1970 – just four years after Mr. Aziz's wrongful conviction – to investigate corruption within the NYPD.  It examined the period from the 1960s through the end of its investigation in October 1971.  On December 26, 1972, the Commission issued its report, "The Knapp Commission Report on Police Corruption" (the "Knapp Commission Report" or "Report"), confirming the existence of widespread police corruption.

180.     Importantly, the Knapp Commission found that the organizational fragmentation of the NYPD contributed to this problem of systematic police corruption.  It wrote in its Report that during the period relevant here, "a number of administrative defects precluded effective investigations of police corruption in New York City and indicated a lack of adequate planning by the Department's top management." (Ex. A, Knapp Commission Report, at 205.)  It found in particular that "the Department's machinery for detecting and investigating police corruption was fragmented and even when unified was not given official standing, adequate records, or adequate manpower." (*Id.*)

181.     Referring to a 1967 report by the International Association of Police Chiefs, the Knapp Commission noted that "the various units charged with searching out misconduct within the Department and with maintaining internal discipline, efficiency and integrity were widely dispersed, poorly coordinated, undermanned and, in many instances, so misdirected that they were almost totally ineffective in rooting out corrupt policemen." (*Id.*)  Among these units was BOSSI, which, along with the Central Investigations Division, was one of two principal intelligence units at the time.

182.     In 1971, while the Knapp Commission investigation was ongoing, a group of sixteen individuals filed *Handschu v. Special Services Division*, a class-action lawsuit brought against the City, the NYPD, and BOSSI in the United States District Court for the Southern District of New York.  The suit challenged the intelligence unit's routine and widespread violation of the plaintiffs' constitutional rights through unlawful surveillance and other activities.

183.     As alleged in the complaint, BOSSI conducted investigations "on a whim, in secrecy, without any civilian or judicial oversight." *Handschu v. Special Servs. Div.*, 605 F. Supp. 1384, 1416 (S.D.N.Y. 1985).

184.     The case settled in 1985, resulting in a consent decree setting forth guidelines for police surveillance and investigations involving political activity.  In approving the proposed settlement, the court observed that under these guidelines, "[t]he NYPD can no longer commence or continue investigations and surveillance secretly and in silence." *Id.* at 1411.

185.     The Knapp Commission investigation and *Handschu* lawsuit provided a rare glimpse into the covert operations of BOSSI.  They revealed that at the time of Mr. Aziz's arrest and conviction, BOSSI operated with minimal to no supervision and ample impunity.  They further revealed that Defendant the City of New York was deliberately indifferent to or endorsed police misconduct, including suppression of exculpatory information like that which occurred in Mr. Aziz's case.

186.     The City, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the suppression of exculpatory information, particularly in homicide cases like Mr. Aziz's, where arrest and conviction were most desired by the City.

187.     At all relevant times, the City's policies, rules, and procedures governing documentation and disclosure of information collected during criminal investigations did not require

City employees to document or disclose *Brady* information to suspects or defendants, courts, and, in many cases, prosecutors.

188.     These policies, customs, and practices proximately caused the violations of Mr. Aziz's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

189.     The City's policy and practice was to tolerate, fail to discipline, and encourage violations of officials' constitutional obligations to make timely disclosure to the defense of *Brady* information.  The City's deliberate indifference to such violations created a laissez-faire atmosphere that caused such violations to continue, including in Mr. Aziz's case.

190.     Under the City's policies, customs, and practices, officials were permitted and encouraged to refrain from making any record of *Brady* information, despite the fact that disclosure of such information was and is constitutionally required regardless of whether the information was recorded in written form.

191.     The City's training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

192.     Officials were trained on avoiding the creation of *Brady* material, instructed not to disclose *Brady* information if they could rationalize non-disclosure by subjectively assessing the information as "unreliable" or "incredible," and encouraged to cover up *Brady* information kept hidden by others.

193.     Officials were permitted and encouraged not to comply with ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal and during collateral attacks on convictions; and even to lie or mislead courts in affidavits and testimony, all with the aim of protecting each other and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

194.    Through a policy, custom, and practice of not disciplining officials for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), the City encouraged such violations by demonstrating to officials that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements.  To the contrary, officials who violated defendants' due process rights were praised for maintaining the confidentiality of the BOSSI intelligence machinery.

195.    During the relevant period, the City had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other constitutional violations by officials.  In fact, there was no such process or penalties, and the City's disclosure policies did not require City employees to disclose *Brady* information.

196.    During the relevant period, the City provided no training on the legal obligation to turn over *Brady* information.

### 2. The City's Unlawful Policies, Customs, and Practices Concerning the Use of Suggestive Identification Procedures and the Fabrication of Eyewitness Identifications and Testimony

197.    At the time of Mr. Aziz's arrest and prosecution, the City also created and/or maintained policies, customs, and practices of deliberate indifference to violations by its employees of the constitutional rights of individuals who were investigated and criminally prosecuted, including through: (1) using unduly suggestive identification procedures, (2) manufacturing false and misleading evidence and testimony through use of such identification procedures; (3) causing false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; and (4) covering up these unlawful practices and suppressing *Brady* information.

198.    Scientific research has demonstrated (and courts have repeatedly recognized) over the last half-century that the identification procedures used in Mr. Aziz's case were then and are now unduly suggestive and corrupting and result in a high risk of false recognition and misidentifications.

199.    The manner in which the NYPD Case Detectives conducted the identification procedures in Mr. Aziz's case was known to be improper even back in 1965.

200.    At the time, it was a basic tenet of eyewitness identification science that the administrator of an identification procedure must not in any way steer a witness's focus to the suspect specifically as opposed to all the participants equally.

201.    The composition of the photo array or lineup is critical in this regard, and it was widely established in 1965 that non-suspect photographs and/or live lineup members must be selected such that the suspect does not stand out from among the other fillers.   Accordingly, identification procedures should include members with approximately the same physical characteristics and appearance, including size, race, complexion, and clothing.

202.    As experts in 1965 observed, placing a suspect with a distinctive physical feature or article of clothing among a group of otherwise uniform fillers is grossly suggestive.   It is not made any less suggestive by the fact that the suspect naturally had the feature or was wearing that article of clothing at the time of his arrest and that it was not forced upon him by the police.   Even more egregious is allowing or forcing a suspect to appear in an identification procedure while he alone shares a feature with the perpetrator or is dressed in clothes similar or identical to those worn by the perpetrator.

203.    The number of fillers can also have an improperly suggestive influence.   It was well known during the relevant period that the smaller the number of participants, the greater the risk of prejudice.   For example, experts found that show-ups, where the suspect is shown alone to the witness,

are particularly fatal given that eyewitnesses are predisposed to believe that the person brought before them are the probable offenders, and all the more so in the absence of any alternative suspect. A similar risk of misidentification arises where a witness is presented with only a single photograph or a small set of photographs.

204.    Experts in 1965 also recognized the substantial risks with conducting multiple identification procedures where the same witness is asked to view the same suspect. Studies showed that repeated procedures introduce a bias so that the witness is more likely to select the suspect, even if innocent, from a second procedure due either to their misplaced familiarity from having previously seen the suspect or their prior commitment to their initial identification decision.

205.    Finally, it was widely known at the time that identification procedures should be recorded, in part to preserve the evidentiary value of the procedures and to ensure that the procedures can be recreated for any subsequent court hearing or legal proceeding.

206.    Despite this well-established science on eyewitness identification, the City failed to implement necessary safeguards for properly constructing and conducting eyewitness identification procedures.

207.    Beyond failing to implement such safeguards, the City – as a matter of policy, custom, and practice – permitted, encouraged, and acquiesced in the use of unduly suggestive identification procedures like those conducted in Mr. Aziz's case, and in the fabrication of evidence and testimony through the use of such procedures and the improper coercion of witnesses.

208.    Under the City's policies, customs, and practices, officials were permitted and encouraged to employ inherently suggestive identification procedures that brought unreasonable attention to innocent individuals and, in turn, resulted in a high risk of misidentifications. Additionally, officials were permitted and encouraged to refrain from memorializing or documenting

identification procedures or pre- and post-identification interactions with eyewitnesses, in part because the City did not *want* any records of its inappropriate procedures.

209.   Under the City's policies, customs, and practices, officials were likewise permitted and encouraged to coerce witnesses through a combination of lies, threats, and promises and to manufacture evidence and testimony, all with the aim of securing speedy arrests and convictions.

210.   During the relevant period, the City also maintained a policy, custom, and practice of failing to train or discipline officials on proper identification procedures or on the duty of officials not to fabricate evidence against criminal defendants or suspects.

211.   These policies, customs, and practices proximately caused the violations of Mr. Aziz's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

212.   These policies, customs, and practices were implemented or tolerated by policymaking officials for the City, who knew or should have known:

    a.   to a moral certainty that such policies, customs, and/or practices concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.   that such issues either present employees with difficult choices of the sort that instruction, training, and/or supervision will make less difficult or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

    c.   that the wrong choice by such employees concerning such issues will frequently cause the deprivation of constitutional rights of criminal suspects or defendants and cause them constitutional injury.

213.   The policymaking officials for the City knew or should have known all this, given:

    a.   the robust science, even as early as 1965, on eyewitness identifications and the increasing evidence that false identifications are a leading cause of the conviction of innocent people;

    b.   credible allegations, many substantiated by judicial decisions, finding that officials had knowingly manufactured false or misleading evidence and/or testimony; and

    c.   civil lawsuits, some of which resulted in substantial verdicts, judgments, or settlements, credibly alleging that police had falsified or exaggerated evidence.

## DAMAGES

214.    This action seeks damages for the period from February 26, 1965 (the date of Mr. Aziz's arrest) through the present.  Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith, and/or malicious acts, misdeeds, and omissions caused Mr. Aziz to be unfairly tried and wrongfully convicted; to endure over 20 years of wrongful imprisonment, including the physical and mental damage arising therefrom; and to spend over 55 years bearing the burden and stigma of being falsely branded as the convicted murderer of an iconic figure in America's civil rights movement.

215.    Mr. Aziz was 26 years old at the time of his incarceration and was released in 1985 at the age of 46.

216.    Mr. Aziz served his sentence in various maximum-security prisons throughout New York State, including Attica, Sing Sing, and Clinton.

217.    His imprisonment spanned from the 1960s through the 1980s, a time period that included the Attica Uprising and well-documented inhumane treatment of prisoners.

218.    To begin his prison term, he spent approximately 18 months in solitary confinement, enduring a practice that a robust scientific literature has established causes serious psychological harm.

219.    Mr. Aziz was never given a reason for being placed in solitary confinement.

220.     Due to his wrongful conviction and imprisonment, Mr. Aziz lost his chance to have meaningful relationships with his family members and friends, including his six children who were between the ages of one and ten at the time of his conviction.

221.     Indeed, one of Mr. Aziz's children was told falsely for 26 years that someone else was her father.

222.     Given the significant length of time between Mr. Aziz's release from prison in 1985 and his exoneration in 2021, his damages extend well beyond his decades of imprisonment.

223.     Mr. Aziz's conviction placed him among the most hated and notorious murderers, and he was made infamous not only by the news media, but also in the recorded history of this country – a stain, and threat, that followed him and his family for decades.

224.     The torment his family suffered exacerbated Mr. Aziz's own torment and the psychological burden he had to bear.

225.     As a direct and proximate result of the acts of Defendants, the injuries and damages sustained by Mr. Aziz, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, and egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity,

vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

226.   All the alleged acts, misdeeds, and omissions committed by the individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of the individual Defendants meets all the standards for imposition of punitive damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

*Denial of Due Process and Right to a Fair Trial,
Fabrication of Evidence, and Suppression of* Brady *Information
(United States Constitution Amendments V and XIV)*

**Against the Individual Defendants**

227.   Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

228.   The individual Defendants, acting knowingly, intentionally, deliberately, with malice, and under color of law, deprived Mr. Aziz of his clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable seizure.  They did so by: (1) using, causing the use of, or failing to intervene in the use of unduly suggestive identification procedures that were intended to and/or created a high risk of false identifications; (2) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony through the use of such identification procedures; (3) fabricating, causing the fabrication of, or failing to intervene in the fabrication of false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; and (4)

45

suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information.

229.    No person of reasonable caution and acting in good faith, having the knowledge and information the individual Defendants had, would have been warranted in concluding that Mr. Aziz was involved in the murder of Malcolm X, such as to support a probable cause determination.  Even setting aside their knowledge that they had used unduly suggestive identification procedures, manufactured evidence and testimony, coerced witnesses, and suppressed *Brady* information, the individual Defendants knew or, in the absence of deliberate indifference, recklessness, and gross negligence, should have known that there were numerous reasons for skepticism about the truth of the identification.  These include but are not limited to: (1) Mr. Aziz's well-supported alibi, (2) the complete absence of physical and forensic evidence tying Mr. Aziz to the murder, and (3) Halim's testimony at trial that Mr. Aziz was in no way involved with the murder.

230.    The presumption of probable cause created by the grand jury indictment is overcome by the fact that Mr. Aziz's indictment was secured based on bad-faith police misconduct. Specifically, the identifications of Mr. Aziz adopted by the eyewitnesses were, upon information and belief, the central piece of evidence presented to the grand jury and proximately caused the resulting indictment.

231.    The individual Defendants knew, intended, or were deliberately indifferent to the fact that the false and misleading evidence would deprive Mr. Aziz of a fair trial and result in his wrongful conviction and incarceration.

232.    The individual Defendants knew, intended, or were deliberately indifferent to the fact that *Brady* information would be concealed from Mr. Aziz and his attorney.

233.    The individual Defendants' conduct, committed in concert with one another or others, deprived Mr. Aziz of his rights under the Constitution: (1) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading evidence, including the identifications and testimonies of the eyewitnesses who were improperly influenced, coerced, and manipulated to give false identifications and testimonies, and whose identifications and testimonies the individual Defendants knew were false, in violation of the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the United States Constitution; and (2) to timely disclosure of material evidence favorable to the defense under *Brady* in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

234.    The individual Defendants' acts and omissions proximately caused the continuation of Mr. Aziz's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

235.    The individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Aziz's constitutional rights.

236.    The individual Defendants' falsification of evidence, coercion of the witnesses, and arrest of Mr. Aziz without probable cause establishes that they acted with actual malice.

237.    The prosecution terminated in Mr. Aziz's favor when his conviction was eventually vacated and the indictment against him dismissed.

238.    Mr. Aziz was, in fact, innocent of the crime for which he was convicted and incarcerated.

239.    The individual Defendants' actions were willful, malicious, oppressive, and reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Malicious Prosecution and Denial of Fourth Amendment Rights*
*(United States Constitution Amendments IV and XIV)*

**Against the Individual Defendants**

240.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

241.    The individual Defendants, acting individually and in concert, with malice, under color of law, and knowing that probable cause did not exist to arrest Mr. Aziz and prosecute him for the murder of Malcolm X, caused Mr. Aziz to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Aziz's clearly established right under the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures.

242.    Specifically, the individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Mr. Aziz, including but not limited to the facts that the witness statements and identifications of Mr. Aziz were fabricated by the individual Defendants and the product of unduly suggestive identification procedures and improper coercion of witnesses, and wholly unreliable, and that those factors as well as additional material exculpatory and impeachment evidence that the individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Aziz.

243.    In addition, the individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Mr. Aziz, including but not limited to their having: (1) used unduly suggestive identification procedures that were intended to

48

and/or created a high risk of false identifications; (2) manufactured false or misleading evidence and testimony through the use of such identification procedures; (3) fabricated false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; and (4) suppressed information about Halim's co-conspirators, other alternative suspects, and the police's own eyewitness account of the murder.

244.    The individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Aziz's constitutional rights.

245.    The individual Defendants initiated and continued the prosecution against Mr. Aziz without probable cause, in violation of Mr. Aziz's clearly established constitutional rights.   No reasonable officer at the time of Mr. Aziz's prosecution or thereafter would have believed this conduct was lawful.

246.    The prosecution terminated in Mr. Aziz's favor when his conviction was eventually vacated and the indictment against him dismissed.

247.    Mr. Aziz was, in fact, innocent of the crime for which he was convicted and incarcerated.

248.    As a direct and proximate result of the individual Defendants' conduct, Mr. Aziz was maliciously prosecuted, wrongly convicted, imprisoned for 20 years, and suffered the other grievous damages and injuries set forth above.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

### Against Defendant the City of New York

249.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

250.    At the time of Mr. Aziz's arrest and prosecution, Defendant the City of New York created and maintained policies, customs, and practices of deliberate indifference to violations of its employees of the constitutional rights of individuals who were investigated and criminally prosecuted, including through: (1) using unduly suggestive identification procedures, (2) manufacturing false and misleading evidence and testimony through use of such identification procedures; (3) causing false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; and (4) covering up these unlawful practices and suppressing *Brady* information.

251.    The violations of Mr. Aziz's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to the City, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Aziz, subject to arrest and investigation by the NYPD, including:

      a. the institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

            i. the duty not to create or use false or misleading evidence, testimony, and witness statements during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

            ii. the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, and

statements whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

iii. the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

b. the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

252. The foregoing express or de facto policies, practices, and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, who knew that such policies, procedures, regulations, practices, and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases.

253. The City knew of the unconstitutional conduct occurring among its employees in light of the numerous credible allegations, many substantiated by judicial decisions, that its employees: (1) wrongfully withheld, lost, or destroyed evidence favorable to the defense that was required to be timely disclosed to the defense under *Brady*; (2) had presented or failed to correct false or misleading identifications, testimonies, and statements from witnesses; and (3) had abused judicial process to coerce false or inherently unreliable identifications, testimonies, and statements from witnesses.

254. Despite this knowledge, the supervisory and policymaking officers and officials of the City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, practices, and customs; did not effectively instruct, train, or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and

disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and customs, described above, with deliberate indifference to the effect their actions would have upon the constitutional rights of individuals and citizens of the City and State of New York.

255.    The aforesaid policies, practices, and customs of the City were substantial, contributing factors in bringing about the aforesaid violations of Mr. Aziz's rights under the Constitution and laws of the United States and in causing his wrongful conviction and resulting damages.

256.    The supervisory and policymaking officers and officials of the City were deliberately indifferent to the manner in which convictions were secured without regard to defendants' constitutional rights or guilt.  The violations of defendants' rights were endemic, and the City was aware of these practices but did not take corrective or preventative action to correct it.

## FOURTH CAUSE OF ACTION

### Malicious Prosecution

*New York State Law*

### Against All Defendants

257.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

258.    The individual Defendants, acting individually and in concert, with malice, and knowing that probable cause did not exist to arrest Mr. Aziz and prosecute him for the murder of Malcolm X, caused Mr. Aziz to be arrested, charged, and prosecuted for that crime.

259.    Specifically, the individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist

to arrest and prosecute Mr. Aziz, including but not limited to the facts that the witness statements and identifications of Mr. Aziz were fabricated by the individual Defendants and the product of unduly suggestive identification procedures and improper coercion of witnesses, and wholly unreliable, and that those factors as well as additional material exculpatory and impeachment evidence that the individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Aziz.

260.    In addition, the individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Mr. Aziz, including but not limited to their having: (1) used unduly suggestive identification procedures that were intended to and/or created a high risk of false identifications; (2) manufactured false or misleading evidence and testimony through the use of such identification procedures; (3) fabricated false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; and (4) suppressed information about Halim's co-conspirators, other alternative suspects, and the police's own eyewitness account of the murder.

261.    The individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Aziz's constitutional rights.

262.    The individual Defendants initiated and continued the prosecution against Mr. Aziz without probable cause.

263.    The prosecution terminated in Mr. Aziz's favor when his conviction was eventually vacated and the indictment against him dismissed.

264.    Mr. Aziz was, in fact, innocent of the crime for which he was convicted and incarcerated.

265.    Defendant the City of New York is liable under the doctrine of *respondeat superior* for the malicious prosecution of Mr. Aziz by the individual Defendants, all of whom were acting as agents of the City of New York and within the scope of their employment.

266.    As a direct and proximate result of Defendants' conduct, Mr. Aziz was maliciously prosecuted, wrongly convicted, imprisoned for 20 years, and suffered the other grievous damages and injuries set forth above.

## FIFTH CAUSE OF ACTION

### New York State Constitution

*Denial of Due Process and Right to a Fair Trial, Fabrication of Evidence,*
*Suppression of Exculpatory Information, and Malicious Prosecution*
*(New York State Constitution, Article I, §§ 5, 6, and 12)*

### Against All Defendants

267.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

268.    The acts and omissions described above caused violations of Mr. Aziz's rights under the New York State Constitution, including the rights to due process and to be free from unreasonable searches and seizures, and Mr. Aziz's resulting damages.

269.    To the extent that any of Mr. Aziz's claims against one or more Defendants is unavailable under 42 U.S.C. § 1983 – including, but not limited to, 42 U.S.C. § 1983's lack of *respondeat superior* liability – Mr. Aziz retains a legal remedy for such claims under the New York State Constitution.

## SIXTH CAUSE OF ACTION

### Negligence

*New York State Law*

### Against Defendant the City of New York

270.    Mr. Aziz repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

271.    Defendant the City of New York is liable for negligence, having breached its duty of reasonable care to Mr. Aziz.

272.    Specifically, and by way of example, the City intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline its agents and employees with regard to the matters described above.  The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Mr. Aziz's wrongful conviction and resulting damages.

273.    The City's negligence and gross negligence directly and proximately caused Mr. Aziz to be wrongly prosecuted and imprisoned for 20 years.

274.    Mr. Aziz was, in fact, innocent of the crime for which he was convicted and incarcerated.  Mr. Aziz's cause of action for negligence was unavailable to him until his prosecution finally terminated in his favor, when his conviction was eventually vacated and the indictment against him dismissed.  Furthermore, this cause of action is tolled as the City concealed from Mr. Aziz – and is still concealing to this day – the conduct giving rise to this cause of action.

275.    As a direct and proximate result of Defendants' conduct, Mr. Aziz was maliciously prosecuted, wrongly convicted, imprisoned for 20 years, and suffered the other grievous damages and injuries set forth above.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Muhammad A. Aziz demands judgment against the above-captioned Defendants as follows:

a. for compensatory damages to be determined at trial, but in all events no less than $40 million;

b. for punitive damages against the individual Defendants in an amount to be determined at trial;

c. for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d. for pre- and post-judgment interest as allowed by law; and

e. for such other relief as this Court deems just and proper.

Dated:   July 14, 2022
New York, New York

SHANIES LAW OFFICE LLC

By: _____

David B. Shanies
Deborah I. Francois
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com

*Attorneys for Plaintiff Muhammad A. Aziz*